Nos. 23-11173, 23-11196

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**STATE OF ALABAMA ex rel., STEVE MARSHALL, ATTORNEY GENERAL, the ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT; ALABAMA POWER COMPANY, and POWERSOUTH ENERGY COOPERATIVE,**

*Petitioners,*

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his capacity as Administrator, United States Environmental Protection Agency,**

*Respondents.*

---

Petitions for Review of Action of the U.S. Environmental Protection Agency

---

**REPLY BRIEF OF ALABAMA AND INDUSTRY PETITIONERS**

---

*Counsel Listed on Inside Cover*

**Steve Marshall**
  *Attorney General of Alabama*
**Robert D. Tambling**
  *Assistant Attorney General*
**Lindsay D. Barton**
  *Assistant Attorney General*
**Steven Shawn Sibley**
  *Deputy Attorney General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: Robert.Tambling@AlabamaAG.gov

**Paul Christian Sasser, Jr.**
  *Assistant Attorney General*
ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
OFFICE OF GENERAL COUNSEL
P.O. Box 301463
Montgomery, Alabama 36130-1463
Phone: (334) 271-7855
Fax: (334) 260-4544
Email: pcsasser@adem.alabama.goV

*Counsel for the State of Alabama and*
*Alabama Department of Environmental Management*

**C. Grady Moore, III**
**Claire B. Johnson**
BALCH & BINGHAM LLP
1901 6th Avenue N., Ste. 1500
Birmingham, Alabama 35203
Phone: (205) 251-8100
Email: gmoore@balch.com

*Counsel for Alabama Power Company and*
*PowerSouth Energy Cooperative*

*Alabama, et al. v. U.S. EPA, et al.*, Case No. 23-11173

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies the following corporate disclosure statements:

Alabama Power Company ("Alabama Power") is a corporation organized under the laws of the State of Alabama. Alabama Power is a regulated public utility engaged in the generation, transmission, distribution and purchase of electricity and the sale of electric service within a service area comprising most of the State of Alabama. The Southern Company (trading symbol "SO") owns all of Alabama Power's outstanding common stock, which represents a substantial majority of the overall voting power of Alabama Power's equity securities. Alabama Power also has preferred stock outstanding, all of which are publicly traded (trading symbol "ALP PR Q" for 5.00% Series Class A Preferred Stock).

PowerSouth Energy Cooperative ("PowerSouth") is a non-profit generation and transmission cooperative, serving the wholesale power needs of twenty distribution members—sixteen electric cooperatives and four municipal electric systems—for more than one-million end users in thirty-nine Alabama and ten northwest Florida counties. PowerSouth is owned by its twenty distribution members. PowerSouth does not have a parent corporation and has not issued shares

*Alabama, et al. v. U.S. EPA, et al.*, Case No. 23-11173

to the public.   No publicly held company has a 10% or greater ownership in PowerSouth.

Undersigned counsel further certifies that the following persons or entities have been associated with or have an interest in the outcome of this case:

Alabama Department of Environmental Management

Alabama Power Company (ALP-PQ)

Balch & Bingham LLP, Counsel, Alabama Power Company and PowerSouth Energy Cooperative

Barton, Lindsay S. Dawson, Counsel, State of Alabama

Garland, Merrick B., Attorney General, United States Department of Justice

Gettle, Jeananne, Acting Region 4 Administrator, United States Environmental Protection Agency

Jensen, Miranda M., United States Department of Justice

Johnson, Claire B., Counsel, Alabama Power Company and PowerSouth Energy Cooperative

Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice

LeFleur, Lance R., Director, Alabama Department of Environmental Management

Lin, Albert, United States Department of Justice

Marshall, Steve, Attorney General, State of Alabama

*Alabama, et al. v. U.S. EPA, et al.*, Case No. 23-11173

Moore III, C. Grady, Counsel, Alabama Power Company and PowerSouth Energy

   Cooperative

PowerSouth Energy Cooperative

Prieto, Jeffrey M., General Counsel, United States Environmental Protection

   Agency

Regan, Michael S., Administrator, United States Environmental Protection Agency

SABIC Innovative Plastics US, LLC

Sasser, Paul Christian, Jr., Counsel, Alabama Department of Environmental

   Management

Saudi Basic Industries Corporation (2010.SR)

Sibley, Steven Shawn, Counsel, State of Alabama

State of Alabama

The Southern Company (SO) (Parent Company of Petitioner Alabama Power

   Company)

Tambling, Robert D., Counsel, State of Alabama

United States Environmental Protection Agency

**Dated: January 10, 2024**

                      Respectfully submitted,

                      STEVE MARSHALL
                      ATTORNEY GENERAL

*Alabama, et al. v. U.S. EPA, et al.*, Case No. 23-11173

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ Lindsay S. Dawson Barton
Lindsay S. Dawson Barton (DAW017)
*Assistant Attorney General*

/s/ Steven Shawn Sibley
Steven Shawn Sibley (SIB002)
*Deputy Attorney General*

**ADDRESS OF COUNSEL:**
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: Robert.Tambling@AlabamaAG.gov

/s/ Paul Christian Sasser, Jr.
Paul Christian Sasser, Jr.
*Assistant Attorney General*

**ADDRESS OF COUNSEL:**
Alabama Department of Environmental Management
Office of General Counsel
P.O. Box 301463
Montgomery, Alabama 36130-1463
Phone: (334) 271-7855
Fax: (334) 260-4544
Email: pcsasser@adem.alabama.gov
        ssibley@adem.alabama.gov

*Alabama, et al. v. U.S. EPA, et al.*, Case No. 23-11173

s/ C. Grady Moore III
C. Grady Moore III
Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Alabama Power Company and*
*PowerSouth Energy Cooperative*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................ C-1

TABLE OF CONTENTS ...................................................................... i

TABLE OF CITATIONS ....................................................................... ii

ARGUMENT .......................................................................................1

    I.  EPA's Unlawful Disapproval Would Nullify the CAA's
Cooperative Federalism Scheme ..............................................2

    II.  Alabama's Adoption of a 1 ppb Threshold Is Consistent with the
Act ...........................................................................................9

    III. Alabama's Weight-of-Evidence Analysis Is Consistent with the
Act .........................................................................................13

    IV. EPA Cannot Dispute Record Evidence that No Cost-Effective
Reductions Are Available in Alabama .....................................17

    V.  Venue Is Proper Only in This Court .......................................20

    VI. Vacatur of EPA's Disapproval of Alabama's SIP Is Appropriate......25

CONCLUSION...................................................................................28

CERTIFICATE OF COMPLIANCE ...................................................30

CERTIFICATE OF SERVICE ...........................................................31

# TABLE OF CITATIONS

**Cases**                                                                 **Page(s)**

*Alabama Env't Council v. EPA*,
   711 F.3d 1277 (11th Cir. 2013) .................................................................2, 3, 10

*Alaska Dep't of Env't Conservation v. EPA*,
   540 U.S. 461 (2004).................................................................................3

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...........................................................25

*Arizona ex rel. Darwin v. EPA*,
   815 F.3d 519 (9th Cir. 2016) ..............................................................7

*Association of Irritated Residents v. EPA*,
   686 F.3d 668 (9th Cir. 2012) ..............................................................8

*ATK Launch Sys., Inc. v. EPA*,
   651 F.3d 1194 (10th Cir. 2011) ....................................................22, 23

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) .........................................................25

*Catawba County v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) ..............................................................8

*City of Seabrook v. EPA*,
   659 F.2d 1349 (5th Cir. 1981) .....................................................3, 6, 7

*EPA v. EME Homer City Generation, LP*,
   572 U.S. 489 (2014)...................................................3, 4, 8, 14, 17

*Kentucky v. EPA*,
   Nos. 23-3216/23-3225 (6th Cir. July 25, 2023) ....................................21, 24, 25

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ............................................................................4

*Luminant Generation Co. v. EPA*,
　714 F.3d 841 (5th Cir. 2013) ....................................................................5

*Miccosukee Tribe of Indians v. U.S.*,
　566 F.3d 1257 (11th Cir. 2009) ...............................................................8

*Nat. Res. Def. Council ("NRDC") v. EPA*,
　489 F.3d 1250 (D.C. Cir. 2007) .......................................................12, 27

*North Dakota v. EPA*,
　730 F.3d 750 (8th Cir. 2013) ...................................................................7

*Ohio v. EPA*,
　No. 23A349 (S. Ct. Oct. 30, 2023) ...................................................21, 22

*Oklahoma v. EPA*,
　723 F.3d 1201 (10th Cir. 2013) ...............................................................7

*\*RMS of Georgia, LLC v. EPA*,
　64 F.4th 1368 (11th Cir. 2023) .........................................................20, 22

*Sierra Club v. Ga. Power Co.*,
　443 F.3d 1346 (11th Cir. 2006) ...............................................................9

*Sierra Club v. Van Antwerp*,
　526 F.3d 1353 (11th Cir. 2008) .............................................................25

*Southern Ill. Power Coop. v. EPA*,
　863 F.3d 666 (7th Cir. 2017) .................................................................22

*Texas v. EPA*,
　No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) ...............22

*Texas v. EPA*,
　829 F.3d 405 (5th Cir. 2016) .................................................................24

*Texas v. EPA*,
　983 F.3d 826 (5th Cir. 2020) ...................................................................9

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001) ...................................................................................4

*West Virginia Chamber of Com. v. Browner*,
    No. 98-1013, 1998 WL 827315 (4th Cir. Dec. 1, 1998) ...................................22

*Westar Energy, Inc. v. EPA*,
    608 F. App'x 1 (D.C. Cir. 2015) ...................................................................6

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ....................................................................6

*\*Wyoming v. EPA*,
    78 F.4th 1171 (10th Cir. 2023) ...............................................3, 9, 12, 15, 17, 26

**Federal Statutes**

42 U.S.C. § 7401(a) ...................................................................................5

42 U.S.C. § 7409(a) ...................................................................................5

42 U.S.C. § 7410(a) ..................................................................................21

42 U.S.C. § 7410(a)(2)(F) ...........................................................................5

42 U.S.C. § 7410(a)(2)(D) .......................................................................3, 5

42 U.S.C. § 7410(k) ..................................................................................21

42 U.S.C. § 7410(k)(3) ...............................................................................2

42 U.S.C. § 7475(a)(3) ..............................................................................12

**Federal Regulations**

40 CFR § 52.21(k)(1) ................................................................................12

**Federal Register**

85 Fed. Reg. 12,232 (Mar. 2, 2020) .............................................................19

87 Fed. Reg. 9,477 (Feb. 22, 2022) ........................................11

87 Fed. Reg. 20,036 (Apr. 6, 2022) ........................................17

87 Fed. Reg. 64,412 (Oct. 25, 2022) ........................................9

88 Fed. Reg. 9,336 (Feb. 13, 2023) .............................14, 20, 21, 24, 27

88 Fed. Reg. 33,240 (May 23, 2023) ........................................21

88 Fed. Reg. 67,102 (Sept. 29, 2023) ........................................26

88 Fed. Reg. 87,720 (Dec. 19, 2023) ........................................21

**Miscellaneous**

Alabama SIP ("Ala. SIP"), EPA-R04-OAR-2021-0841-0026 (June
    2022) ........................................6, 14, 15, 18, 20

*Comments of Alabama Power Company, Southern Power Company,
    and PowerSouth Energy Cooperative on EPA's Proposed
    Disapproval of Alabama's Interstate Transport SIP for the 2015
    Ozone NAAQS*, EPA-R04-OAR-2021-0841-0034 (Nov. 2022)
    [hereinafter "*Disapproval Comments*"] ........................................16

EPA, *Legal Memorandum Application of Significant Impact Levels in
    the Air Quality Demonstration for Prevention of Significant
    Deterioration Permitting under the Clean Air Act* (Apr. 2018),
    http://tinyurl.com/4mcc5t86 ........................................13

EPA, *Ozone Air Quality Assessment Tool (AQAT) Results*,
    http://tinyurl.com/4e39pmz3 ........................................27

EPA, *Ozone Transport Policy Analysis Proposed Rule TSD*, EPA-HQ-
    OAR-2021-0668-0133 (Feb. 2022) ........................................17

EPA, *Ozone Transport Policy Analysis Final Rule TSD*, EPA-HQ-
    OAR-2021-0668-1080 (Mar. 2023) ........................................18

EPA, *2015 Ozone NAAQS Interstate Transport SIP Disapprovals—Response to Comment (RTC) Document*, EPA-HQ-OAR-2021-0663-0083 (Feb. 2023) ...............................................................16

*Tsirigotis, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport SIP Submissions for the 2015 Ozone NAAQS*, EPA-HQ-OAR-2021-0663-0004 (Aug. 2018) ........................................................10, 11

## **ARGUMENT**

At issue is Alabama's primary role under section 7410 of the Clean Air Act (the "Act" or "CAA") and how EPA usurped that role.  EPA's brief assembles strawmen or, in several cases, misstates the record, but EPA does not dispute that Alabama sources would account for vanishingly small contributions of ozone to the Houston metroplex.  Once EPA's strawmen are debunked, this is clear: Alabama's determination that those negligible contributions are not "significant" was both consistent with the Act and well supported by record evidence.

*First*, if EPA's approach is accepted, cooperative federalism is a dead letter. If EPA can substitute its own policy preferences for the states', as EPA's brief claims, then it can always deny any state implementation plan ("SIP").  This would directly conflict with the Act's specific grant of primacy to the states.

*Second*, EPA never explains how a 1 ppb screening threshold is inconsistent with the Act.  Instead, in an effort to sidestep EPA's very *endorsement* of that screening threshold, EPA misrepresents its guidance to shore up an invented, non-statutory "additional analysis" requirement.

*Third*, EPA doubles down on its unlawful rejection of Alabama's weight-of-evidence analysis.  EPA's brief offers no response to the fact it separately assessed each element of the weight-of-evidence analysis against the individual steps of

1

EPA's preferred (but, again, non-statutory) "4-step method." In doing so, EPA misses the entire point of a weight-of-evidence analysis.

*Finally*, EPA performs somersaults to ignore record evidence, including emissions data and cost analyses from EPA's own database. Even if EPA were entitled to enforce its extra-statutory policies (which it is not), EPA's own data should have resulted in approval of Alabama's SIP.

Ultimately, EPA's brief lays bare the Agency's commitment to federalizing Alabama's air control program.

## I.    EPA's Unlawful Disapproval Would Nullify the CAA's Cooperative Federalism Scheme

EPA's brief confirms it did not review Alabama's section 7410 SIP for consistency with the Act; rather, it reviewed the SIP for compliance with EPA's preferred policies. *See* Respondents' Br. ("Resp.") 16-20, Doc. 40. That was unlawful and wholly infected EPA's disapproval. *See* 42 U.S.C. § 7410(k)(3) (EPA "shall approve [a SIP]…if it meets all of the applicable requirements of [the Act]"); *Ala. Env't Council v. EPA* ("*AEC*"), 711 F.3d 1277, 1280 (11th Cir. 2013) ("If the SIP…meets the requirements in the Clean Air Act, the EPA must approve it.").

EPA gives lip service to the states' primary role in developing good neighbor SIPs, Resp. 6, but then repeatedly claims *its* decision to disapprove Alabama's reasonable SIP should be given a "deferential review," Resp. 22, 23, 39, 49. In other words, EPA refuses to grapple with the limits of its own authority in reviewing

2

reasonable state plans.  EPA's mistake is to believe it can substitute its own policy judgments for the state's, but EPA's review cannot abrogate Congress's cooperative federalism scheme.  *See AEC*, 711 F.3d at 1280 ("states have 'primary responsibility'" (citation omitted)); *Wyoming v. EPA*, 78 F.4th 1171, 1178 (10th Cir. 2023) ("[i]t is well established that 'the Clean Air Act uses a cooperative-federalism approach'" and "the initial [SIP] responsibility falls to the states" (citation omitted)).  Indeed, EPA's brief never even references the concept of cooperative federalism.

Ultimately, EPA's task was to review whether *Alabama's* submission was reasoned and consistent with the Act, *see* 42 U.S.C. § 7410(a)(2)(D), but instead EPA wrongly considered only whether the submission satisfied *EPA's* own policy preferences.  *Compare* Resp. 8-12, 16-20, *with Wyoming*, 78 F.4th at 1181 (EPA determines whether a state's "analyses are beyond the range of reasonableness afforded to the state by the Clean Air Act"); *see also Alaska Dep't of Env't Conservation v. EPA* ("*Alaska*"), 540 U.S. 461, 490 (2004); *City of Seabrook v. EPA*, 659 F.2d 1349, 1356 (5th Cir. 1981). EPA's demand for "additional" or heightened analyses (which it never defines) whenever Alabama deviates from the Agency's preferences is beyond its authority.  *See Wyoming*, 78 F.4th at 1177 (vacating EPA's disapproval of Wyoming's SIP, finding "the state hit the CAA's statutory requirements"); *accord. EPA v. EME Homer City Generation, LP*, 572 U.S. 489,

514 n.15 (2014) ("EPA's task" is to step in "only after a State has failed to propose a SIP adequate for compliance").

Accordingly, EPA's appeal for "deference" is upside down.  Certainly, no deference is owed when EPA applies non-statutory criteria.  *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to…pre-empt the validly enacted [action] of a sovereign State, unless and until Congress confers power upon it."); *see also* Petitioners' Br. ("Br.") 23, 25-32, 36-49, Doc. 35.   As the Supreme Court explained in *U.S. v. Mead Corp.*: "where it is in doubt that Congress actually intended to delegate particular interpretive authority to an agency, *Chevron* [deference] is 'inapplicable.'"  533 U.S. 218, 230 (2001).  And here, Congress plainly delegated primary authority to the states.

EPA makes much of the complex, "interstate nature" of ozone and its purported "special expertise," as if that expands EPA's statutory charge.  Resp. 2, 10, 23, 48, 51.  But the Supreme Court already found that *states* define "contribute significantly" in the first instance—not EPA.  *EME Homer*, 572 U.S. at 513.  This would make no sense if only EPA had the expertise to do so.  *See also id.* at 539 (Scalia, J. dissenting) (quoting EPA's brief: "States routinely undertake technically complex air quality determinations").  And, in any event, Congress spoke clearly to the contrary in the *opening sentences* of the Clean Air Act:

The Congress finds–

(1)    that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which…often extend into two or more States;

(2)    that the growth in the amount and complexity of air pollution brought about by urbanization [inter alia] has resulted in mounting dangers to the public health and welfare…;

(3)    that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the ***primary responsibility of States***[.]

42 U.S.C. § 7401(a) (emphasis added).  Inescapably, Congress appreciated the challenges associated with interstate transport, yet made clear that pollution prevention and control remains "the primary responsibility of States." *Id.*  And Congress was equally plain when it intended to alter this core principle.  *See, e.g.*, *id.* § 7410(a)(2)(F) (***EPA*** "may…prescribe[]" certain monitoring or reporting be part of a SIP); *id.* § 7409(a) (***EPA*** "*shall* publish proposed regulations" (emphasis added)).  Yet the text of section 7410(a)(2)(D)—the provision at issue here—makes no reference to EPA.

To be clear, Petitioners never argue EPA must wholly defer to Alabama and not substantively review the SIP for *consistency with the Act*.  *Contra* Resp. 39. Where a SIP, for example, ignores defined terms it may be inconsistent with the Act. *See Luminant Generation Co. v. EPA*, 714 F.3d 841, 856-57 (5th Cir. 2013) (relying on the Act's definition of "emission limitation" in finding Texas's SIP was "inconsistent with…the Act").  Likewise, as EPA itself pointed out, a federal (or

state) plan that disregards statutory attainment dates would be inconsistent with the Act. Resp. 8 (citing *Wisconsin v. EPA*, 938 F.3d 303, 313-16 (D.C. Cir. 2019)). In contrast, EPA points to no similarly concrete inconsistency here; rather, all the "flaws" EPA purports to identify are differences in judgment based not on the statute but on EPA's current policy. Resp. 2, 12, 18.

Likewise, Petitioners do not argue that EPA could never disapprove an empty SIP. For example, Kansas's SIP in *Westar Energy, Inc. v. EPA* was a one-page plan, devoid of "any analysis at all of the downwind effect of its in-state emissions." 608 F. App'x 1, 3 (D.C. Cir. 2015). Alabama's SIP is not remotely comparable—its SIP submittal used EPA's own modeling results and provided a detailed weight-of-evidence analysis. *See generally* Br. 25-53; Ala. SIP, EPA-R04-OAR-2021-0841-0026 (June 2022).

EPA's attempt to limit the holding in *City of Seabrook* also misses the point. There, the Fifth Circuit (prior to its split) distinguished between EPA's obligation to approve a plan ("shall approve") and its considerably narrower authority to disapprove a plan (Congress "nowhere prescribes when the Administrator 'shall disapprove'"). *See* 659 F.2d at 1355-57. The court ascribed this difference to "the central purpose[] of the Clean Air Act [which] was to place the 'primary responsibility' for assuring air quality on the states." *Id.* at 1356. EPA cannot explain away this holding:

It would be inconsistent with this purpose to hold that the EPA must mechanically disapprove a state's SIP revisions even though the revisions "substantially comply" with the statute. This is especially so when the statutory language gives at best uncertain guidance as to precisely what it required. In these circumstances, we find it unlikely that Congress intended the imposition of a federal plan to be preferred[.]

*Id.*  The Court's endorsement of cooperative federalism in *Seabrook* is plainly applicable here: EPA would impose a federal plan on Alabama even though Alabama's state plan is entirely consistent with the Act.  That result flies in the face of this precedent.

EPA next attempts to cabin the holding in *Alaska* because it is not a SIP case.  Resp. 36.  But EPA itself repeatedly cites SIP cases that rely on *Alaska*.  For example, EPA cites *Arizona ex rel. Darwin v. EPA*, 815 F.3d 519 (9th Cir. 2016), Resp. 36, which explicitly states "as [*Alaska*] put it, EPA may not 'second guess' reasoned, legally compliant state decisions," 815 F.3d at 532.  Similarly, EPA cites *North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013), which relies on *Alaska*, and *Oklahoma v. EPA*, 723 F.3d 1201 (10th Cir. 2013), which quotes *Alaska* and explains that "EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP," 723 F.3d at 1213 n.7.  *See* Resp. 37.  And, in both *North Dakota* and *Darwin*, EPA's disapproval was affirmed because the SIPs at issue were unreasoned.

EPA's appeals to *Catawba County v. EPA*, 571 F.3d 20 (D.C. Cir. 2009), *Association of Irritated Residents v. EPA*, 686 F.3d 668 (9th Cir. 2012), and *Miccosukee Tribe of Indians v. U.S.*, 566 F.3d 1257 (11th Cir. 2009), are equally unhelpful.  In *Catawba*, the D.C. Circuit assessed EPA's authority under a different section of the Act and was not about EPA's role relative to states.  571 F.3d at 35.  In *Association of Irritated Residents*, the Ninth Circuit overturned EPA's approval of a California SIP where EPA had not even reviewed portions of the SIP at all.  686 F.3d at 673.  And the *Miccosukee* case does not involve either the CAA or the EPA.  Indeed, this Court's general endorsement of respect for agency expertise in that case, *see* 566 F.3d at 1264, applies more squarely to *Alabama* than EPA here, given that the Act identifies the state as the primary actor and the Supreme Court has confirmed that *states* are expected to make the "predictions," *id.*, at issue.  *See EME Homer*, 572 U.S. at 514 n.15.

And, while EPA points to *EME Homer* to defend its position, Resp. 38, that case also supports Petitioners, *see* Br. 15-16, 23-24.  EPA ignores that the Supreme Court explained EPA is "called upon to act" "only *after* a State has failed to propose a SIP" that is "adequate."  *Id.* (emphasis added).  And, crucially, "the Good Neighbor Provision is initially directed to upwind States."  *Id.*

In the end, none of the cases EPA cites support its position here: that it may disapprove a SIP that is consistent with the Act based on its own policy preferences

and non-statutory factors. No court has found EPA has that authority—because Congress did not grant it.

## II.    Alabama's Adoption of a 1 ppb Threshold Is Consistent with the Act

After considering guidance and analysis from EPA, Alabama determined a 1 ppb screening threshold for defining "significant contribution" was appropriate. *See* Br. 25-36. EPA's briefing does not argue that the 1 ppb screening threshold is unreasonable or inconsistent with the Act. No such finding is in the record, and, given EPA's own guidance and use of the same screening threshold, *see id.*, such a finding would be unsupportable. Apparently recognizing this, EPA changes the question and claims Alabama did not "sufficiently justif[y]" adopting a screening level slightly higher than the one preferred by EPA. Resp. 40; *see also* 87 Fed. Reg. 64,412, 64,423-24 (Oct. 25, 2022).

Essentially, EPA adopted a presumption in favor of its preferred, extra-statutory screening level, *cf. Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020) ("the Act contains no numeric threshold" defining significant contribution), and required Alabama to overcome EPA's invented presumption. But the CAA does not authorize EPA to do that. *Cf. Sierra Club v. Ga. Power Co.,* 443 F.3d 1346, 1354 (11th Cir. 2006) (noting EPA policy preferences cannot automatically dislodge a state's SIP authority); *see also Wyoming*, 78 F.4th at 1178 (explaining "states have the most discretion—and the EPA owes the most deference" when states choose

9

whether to apply EPA guidance to interstate SIPs). And, critically, EPA offers no support for such an approach. Instead, EPA must judge whether Alabama's application of a 1 ppb threshold is consistent with the Act on its own merits. *See AEC*, 711 F.3d at 1280.

Regardless, EPA's demands for "justification," Resp. 17, are meritless because Alabama's SIP relied on EPA's own analysis and application of the exact same 1 ppb threshold. EPA's August 2018 Guidance (which EPA calls the "Threshold Memo") plays a key role here. Both parties agree the guidance endorses use of a 1 ppb screening threshold, but EPA insists the guidance required Alabama to supply its own "technical justification" in order to employ the 1 ppb threshold. Resp. 41. EPA repeats this several times in a bid for legitimacy, but it is not true. *See id.* at 17, 21, 42, 43, 47. What the August 2018 Guidance says is:

> [I]n developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework *or develop alternative frameworks* to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA.

EPA-HQ-OAR-2021-0663-0004, at 2 (emphasis added). The "adequate technical justification" qualification is a reference to use of an entirely alternative framework to EPA's 4-step methodology. This qualification does not demand new or additional justification of the 1 ppb screening threshold (which is merely the application of Step 2 within EPA's own framework).

And this makes sense because EPA's August 2018 Guidance <u>already analyzed</u> <u>the use of a 1 ppb threshold within EPA's existing framework</u> and attached specific data concerning that threshold for states to consider. That is, EPA already supplied sufficient "technical justification" for use of the 1 ppb threshold, stating: "[b]ased on <u>the data and analysis summarized</u> here, the EPA believes that a threshold of 1 ppb may be appropriate…." *Id.* at 3 (emphasis added) (referring to data in tbls. 1-3). Specifically, in Table 3, EPA assessed the appropriateness of a 1 ppb screening threshold *for the specific non-attainment areas involved* here. *See id.* at tbl. 3. In that table, EPA data show that a 1 ppb screening threshold is largely equivalent to a 0.7 ppb threshold for the Texas counties EPA linked to Alabama in its proposed disapproval. *Id.* (detailing 100% comparative effectiveness for Denton and approximately 86% average for Harris). EPA's insistence on "additional" analysis ignores this completely.

Nonetheless, Petitioners did, in fact, provide additional analysis to support use of the threshold. EPA attempts to dodge this record evidence. EPA first disclaims its own 1 ppb threshold analysis from the Iowa SIP, which Petitioners used as a model. Resp. 44-45. While EPA ultimately withdrew its Iowa SIP proposal, that was because EPA's modeling changed, not because EPA disavowed its analysis. *See* 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022). Now EPA opposes the 1 ppb threshold simply because the Agency has changed its policy. *See* Resp. 44. But EPA's brief

11

never suggests that screening out contributions less than 1 ppb would be inconsistent with the Act itself, and this remains true despite the shifts in Agency preferences because Agency preferences do not override Congress. *See Wyoming*, 78 F.4th at 1179 (EPA may not "ignore[]…statutory restriction[s]" in reviewing a state's SIP).

Alabama also adopted the 1 ppb screening threshold because it is consistent with other uses of the term "contribute" in the Act. EPA's brief claims that the "PSD" program, which uses a 1 ppb screening level, "is not relevant" to the contribution threshold in the good neighbor provision. Resp. 42. But this ignores both statutory construction and EPA's contrary statements. While EPA makes much of the distinctions between the PSD program and the good neighbor provision, Resp. 43, the core similarities far outweigh the differences. For example, both programs involve the same NAAQS, apply to the same group of sources, evaluate what sources may contribute to exceedances of the NAAQS, and rely on state-defined control technologies to limit emissions as needed. *See* 42 U.S.C. § 7475(a)(3) & 40 C.F.R. § 52.21(k)(1).

Given the similarities, these provisions should be read *in pari materia*, such that "contribute" in the PSD program indicates something less intensive than "contribute *significantly*" in the good neighbor provision. *See NRDC v. EPA*, 489 F.3d 1250, 1260 (D.C. Cir. 2007) (reading sections of the CAA "*in pari materia*"). And, EPA has already agreed with this. In a memorandum on this issue, EPA

confirms "the use of 'significant' or 'significantly'…call[s] for a higher degree of contribution than required under [the PSD program]." EPA, *Legal Memorandum Application of Significant Impact Levels in PSD Permitting*, at 9 n.6 (Apr. 2018), http://tinyurl.com/4mcc5t86; *see also* Br. 7-8.  EPA's brief fails to respond to this statement.

Finally, EPA strangely asserts the State must provide "reliance interests" to support its use of the August 2018 Guidance.  Resp. 47.  But, neither of the cases EPA cites, *id.*, has anything to do with state action taken in view of federal agency guidance.  Moreover, it is nonsensical to argue Alabama must prove incurred costs or committed resources in order to consider EPA guidance that has *not been rescinded or revoked*.  Br. 29.  Of course, the consequences of any "reliance" on EPA's guidance are clear enough—EPA has pulled the rug out from under Alabama and federalized its air program.

## III.   Alabama's Weight-of-Evidence Analysis Is Consistent with the Act

Alabama also determined its small contributions to Texas ozone were not "significant" based on a weight-of-evidence analysis.  *See* Br. 36-46.  While EPA admits that such analyses are consistent with the Act, Resp. 10, EPA's brief confirms the Agency again misapprehended its reviewing role.

As an initial matter, EPA incorrectly states that Petitioners "argue Alabama should not be linked to Texas," Resp. 51, but that is *not* Petitioners' argument, Br.

41.  More specifically, EPA argues that Alabama's weight-of-evidence analysis does not overcome EPA's modeling, which identifies contributions to Houston fractionally above 0.7 ppb.  But the weight-of-evidence analysis is not a replacement for the modeling; instead, it considers the modeling *in context* and <u>weighs</u> all the <u>evidence</u> together.

Alabama's analysis concludes that emissions from the State "do not significantly contribute" to ozone issues in Houston, even accepting a 0.75 ppb modeled contribution.  Ala. SIP 106.  As EPA itself has acknowledged, Alabama is entitled to conduct its own analysis, using various data points, to determine whether that single, small projected contribution is significant.  88 Fed. Reg. 9,336, 9,338 (Feb. 13, 2023); *see also EME Homer*, 572 U.S. at 510.[1]  This is precisely what Alabama did.  *See generally* Ala. SIP.  In all its discussion on modeling, it is telling that EPA acknowledges only once in its brief that Alabama is modeled to contribute a mere 0.75 ppb to a single downwind receptor.  Resp. 16.

Centrally, EPA's brief does not—and cannot—deny it employed its preferred 4-step framework to segment Alabama's weight-of-evidence analysis in

---

[1] The Supreme Court in *EME Homer* made clear that states should not wait for EPA to define significant contribution, therefore, Alabama went forward with its analysis using EPA modeling, along with other data points, to define significance.  *See* 572 U.S. at 510. Yet, now EPA is arguing, in effect, that the states do not have the authority to define their own significance.  *See* Resp. 19 (finding all states failed to use alternative thresholds and methods).

disapproving Alabama's SIP. *See* Br. 46-49. Rather than engaging in a holistic review of Alabama's SIP submission, EPA focused on individual elements in isolation. But "[a]llowing the EPA to deem an analysis…reasonable only if the state strictly and correctly followed the [4-step framework] would effectively re-write the Act." *Wyoming*, 78 F.4th at 1181.

For example, EPA's brief spends almost three pages quibbling over modeling bias and error rates, Resp. 49-51, despite the fact Alabama's SIP (and Petitioners' brief) spends relatively little time discussing modeling bias, *see* Ala. SIP 105; Br. 44. Presumably, EPA believes propping up a strawman about modeling bias will explain away the fact that EPA's modeling remains a moving target. EPA also attacks Alabama's use of back trajectories by stating they have "limited utility" compared to EPA's CAMx modeling. Resp. 52-53. But Alabama's use of a back trajectory analysis is not meant to supplant EPA's modeling. To the contrary, Alabama also relies on EPA's CAMx modeling in its weight-of-evidence analysis in assessing that Alabama's links to Texas receptors are consistently small. *See* Br. 38-39.

Thus, Alabama used NOAA's back trajectories as an *additional tool* to inform its assessment of whether its current suite of emission controls adequately prevents significant contributions. *See* Br. 42. These data were especially useful in Alabama's case because Alabama's single modeled contribution (0.75 ppb) is well

below one of EPA's endorsed screening thresholds (1 ppb) and barely above the other (0.7 ppb). Put another way, back trajectories help further inform judgement, which EPA recognizes, as EPA *itself* uses back trajectories to track ozone contributions. *See* EPA, *Response to Comments*, EPA-HQ-OAR-2021-0663-0083, at 358 (Feb. 2023). But they are not intended to replace EPA's modeling as EPA implies. *See* Resp. 52-53.

EPA also criticizes the record on Alabama's meteorological analysis as limited to ozone and not "transport of ozone precursors." *Id.* However, this complaint patently ignores that Petitioners *did* include this exact data. *Disapproval Comments*, EPA-R04-OAR-2021-0841-0034, at 15-16 (Nov. 2022) (including "EGU emissions of $NO_X$ on the days that could have led to ozone formation" in Texas). Petitioners concluded from this data that "emissions from Alabama EGUs on the relevant days were low, and well below any reasonable conception of 'significant contribution.'" *Id.* at 16. EPA's brief makes no attempt to refute this, instead ignoring record evidence that supports Alabama's SIP.

Ultimately, EPA appears willing to only consider data that is confirmatory of its own modeling, rather than engaging with Alabama's weight-of-evidence analysis. EPA never disputes that it hewed to its 4-step framework to disapprove Alabama's SIP and, in doing so, EPA parsed out evidence individually instead of considering the bigger picture—which convincingly shows that Alabama does not

significantly contribute to downwind attainment issues in Texas.  *But see Wyoming*, 78 F.4th at 1180 (finding EPA erred because its "rejection of the state's [SIP]…[was] grounded in a strict application of…*nonbinding* guidelines").

## IV.    EPA Cannot Dispute Record Evidence that No Cost-Effective Reductions Are Available in Alabama

EPA itself defines "significant contribution" as only those emissions which can be "cost-effectively" reduced.  *EME Homer*, 572 U.S. at 502-03.  Yet, EPA refuses to play by the rules of its own game: faced with unrefuted record evidence that no cost-effective reductions are available under Step 3 of EPA's *own method*, EPA's brief first claims that costs were not evaluated, Resp. 54, then attempts to dismiss part of that evaluation as "anecdotal," Resp. 58.  These claims are false.  *See* Br. 51-53; Ala. SIP 87-89.

First, in its proposed FIP for Alabama, EPA itself conducted the very analysis it claims was never performed.  *See* 87 Fed. Reg. 20,036, 20,076-99 (Apr. 6, 2022) (describing EPA's assessment of available cost-effective emission reductions). This analysis considered "the key question," Resp. 54, of whether mobile sources or other industry had cost-effective reductions available to it.  *See* 87 Fed. Reg. at 20,076-99; *see also* EPA, *Ozone Transport Policy Analysis Proposed Rule TSD*, EPA-HQ-OAR-2021-0668-0133, at App. A (Feb. 2022).  EPA ultimately finalized its conclusion that cost-effective controls could potentially be adopted at only *two* power plant units in Alabama.  *See* EPA, *Ozone Transport Policy Analysis Final*

*Rule TSD*, EPA-HQ-OAR-2021-0668-1080, at App. A (Mar. 2023). Thus, EPA itself had already determined that Alabama <u>does not have any cost-effective controls</u> outside these two units. *See* Ala. SIP at 87-89 (using EPA's data to evaluate cost-effective controls).

Relying on EPA's own analysis, Petitioners then provided EPA, as part of the SIP submission package, details showing that the two remaining candidate units, already equipped with state-of-the-art controls, could make no further cost-effective reductions. Ala. SIP 87-89; *contra* Resp. 55 (claiming this data was developed retroactively). EPA has no response other than to label these data "anecdotal." Resp. 58. Not true. Petitioners provided numerical data from EPA's Clean Air Market Database to show that Plant Gaston Unit 5 has already achieved the "cost-effective" control rate of 0.08 lbs/MMBtu. Ala. SIP 87. Similarly, Petitioners analyzed specific quantitative data on the number of unit starts-ups to explain that Plant Harris Unit 1A could not install any additional cost-effective $NO_X$ controls due to the unit's role in accommodating the increase in solar resources on the electric grid. *Id.* at 88-89. This analysis is entirely unrefuted. As a result, EPA's dismissal of record cost-effectiveness analysis is, at best, arbitrary and capricious and, at worst, suggests the Agency does not take seriously evidence properly presented, in good faith, via public notice and comment.

In a last-ditch effort, EPA complains it can ignore this relevant information because it was originated by the owners of these units instead of the State itself. But, of course, owners have the best information about unit performance. And EPA has itself considered record evidence from other sources—including industry—in other cases. Br. 53. EPA does not deny this. Further, in its review of Iowa's SIP, EPA did exactly what Industry Petitioners do here—provided additional analysis to the record to supplement information originated by the state in its SIP. *See* 85 Fed. Reg. 12,232, 12,236-40 (Mar. 2, 2020). Nor does EPA demand that states originate any of the modeling used to evaluate their SIPs. Nonetheless, EPA turns a blind eye to the additional data.[2]

Finally, EPA's brief makes a speciously misleading argument that "Alabama's Submission should have included provisions to enforce [emission reduction] controls and changes." Resp. 57. But that *presupposes* there are significant contributions from Alabama that require further controls in the first place. This conflates Step 3 of EPA's own methodology, which evaluates the actual, current emissions from existing sources, with Step 4, which requires enforceable limits *only if* cost-effective reductions are in fact identified in Step 3. EPA has never

---

[2] Perhaps EPA continues in its mistaken belief that the cost assessment was derived from data related to the prior, 2008 ozone NAAQS instead of the current, 2015 ozone NAAQS. Petitioners pointed this error out in their brief, Br. 50, and EPA makes no response.

required enforceable limits under Step 3 of its framework for any state, nor in promulgating a FIP. And to be clear, Alabama's SIP does include emission controls, *see* Ala. SIP 101-02, but no *additional* controls are necessary to address the 2015 ozone transport NAAQS because (1) Alabama reasonably concluded it was not significantly contributing downwind and (2) no additional cost-effective controls are available for any mobile or stationary sources.

## V.      Venue Is Proper Only in This Court

Under the CAA, SIPs are stand-alone, state-specific actions. EPA's disapproval of Alabama's SIP is thus a stand-alone action that, by its very nature, is locally applicable, and neither EPA's packaging, nor its statements about "national consistency" can change that.[3]

EPA bases its venue analysis on the faulty assumption that publishing 21 SIP disapprovals in one Federal Register notice transforms them into a single administrative action. *See* Resp. 24.[4] However, venue is not determined based on the contents of the obligatory public notice—it is based on the *action* itself. *See RMS of Georgia, LLC v. EPA*, 64 F.4th 1368, 1372 (11th Cir. 2023) ("analyzing the

[3] Petitioners incorporate by reference their Response to Jurisdictional Question, Doc. 13.

[4] EPA's brief disingenuously calls its Federal Register notice the "Disapproval," Resp. 24, *et seq.*, but the notice is actually entitled "Air Plan Disapproval*s*," 88 Fed. Reg. at 9,336 (emphasis added).

nature of the EPA's action").  Contrary to EPA's assertion that Petitioners are trying "to dictate venue," Resp. 28, it is EPA that has attempted to manufacture venue by bundling its disapproval actions.[5]  But no matter the packaging, the CAA explains: "*Each State* shall…submit[]…a plan," then EPA "shall approve" or "disapprove *the* plan."  42 U.S.C. §§ 7410(a), (k).

Because approval or disapproval of each state's SIP is an independent legal action, it follows that disapproval of Alabama's SIP cannot be nationally applicable. *See Kentucky v. EPA*, Nos. 23-3216/23-3225, slip op. at 5 (6th Cir. July 25, 2023) (SIPs "by their very nature, concern each State's plan").  EPA itself even calls on states to provide "state-specific arguments" in order to "support…a 1 ppb threshold." 88 Fed. Reg. at 9,373.  It belies logic for EPA to argue state plans are nationally applicable, while simultaneously requiring "state-specific arguments"—a fact EPA has perhaps recognized, given it recently admitted in its approval of Wyoming's good neighbor SIP that it "is a locally or regionally applicable action."  *See* 88 Fed. Reg. 87,720, 87,721 (Dec. 19, 2023).

---

[5] EPA admits it could have published the resulting FIPs for each state separately, for example.  Resp. in Opp'n to Appl. for Stay at 24, *Ohio v. EPA*, No. 23A349 (S. Ct. Oct. 30, 2023).  EPA regularly bundles multiple actions under the CAA in a single Federal Register notice without transforming them into *one action*.  *See, e.g.*, 88 Fed. Reg. 33,240 (May 23, 2023) (including new GHG emission rules, as well as the repeal of the Affordable Clean Energy rule).

EPA also falsely claims the good neighbor SIP program is a "'zero-sum' game," just like the program at issue in *RMS*. Resp. 24-25 (quoting *RMS*, 64 F.4th at 1374). This is wrong, and EPA knows it. *See* Br. 58. First, as EPA has explained, the SIP disapproval imposes no direct obligation on industry within Alabama—it is the legal predicate to such action. Respondents' Opp'n to Mot. for Stay 21, Doc. 26-1. Moreover, the status of Alabama's SIP does not affect the good neighbor obligation of any other state.[6] In other words, this is diametrically opposite to the situation at issue in *RMS*, where changes to one company's allocation directly affected other allocations. *See* 64 F.4th at 1373-74.

Furthermore, none of the cases EPA relies on concern the disapproval of a state's SIP; rather, they concern either national SIP calls or section 7407 nonattainment designations. *See W. Va. Chamber of Com. v. Browner*, No. 98-1013, 1998 WL 827315 (4th Cir. Dec. 1, 1998) (SIP call); *Texas v. EPA*, No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) (SIP call); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666 (7th Cir. 2017) (nonattainment designations); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194 (10th Cir. 2011) (nonattainment designation). In fact, the Tenth Circuit in *ATK* contrasted the "purely local" nature of a SIP which is "an

---

[6] *See* Resp. in Opp'n to Appl. for Stay at 24, *Ohio v. EPA*, No. 23A349 (explaining the good neighbor provision is not "premised on accomplishing some minimum total of emissions reductions....Rather, each State must eliminate its own 'significant contribution' to air pollution in downwind States").

undisputably regional action" with a "SIP Call [which] is an EPA rule calling for revision to any SIP not meeting a newly-established standard" and a nonattainment designation, which "creates a standard that applies to the entire country." *Id*. at 1199-1200.

EPA's faulty assumption about the nature of the action equally infects its argument that its locally applicable disapproval was based on a *determination* of nationwide scope or effect. EPA explains that its 21 disapproval actions rest on "nationwide policy judgments" but does not, and cannot, identify a nationwide determination that underlies its Alabama disapproval.

As an initial matter, EPA's attempt to brush past its obligation to publish the requisite finding is problematic. Despite EPA's puzzling claim to the contrary, Resp. 28, Petitioners clearly dispute that EPA "publish[ed] the required determination," because EPA provided only a "generic statement," Br. 60. EPA attempts no answer to this flaw. *Compare id.*, *with* Resp. 28. This alone is fatal to EPA's position.

Further, EPA confuses the measuring stick for the measurement. EPA's examples, like the use of the 2016v3 modeling and alternative contribution thresholds, and use of "nationwide policy judgments," Resp. 31, are just that— *policies* that formed the measuring stick, not SIP-specific *determinations* (*i.e.*, measurements). And EPA's appeals to "health" and "broad geographic scale," *id.*

23

33, are similarly not determinations as to Alabama's SIP.  Elsewhere in its decision, EPA seems to acknowledge that difference: "While EPA used this [4-step] framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits[.]"  88 Fed. Reg. at 9,354 (emphasis added).

Essentially, EPA wishes to rewrite section 7607(b) so it would read "if such action is based on a ~~determination~~ *policy* of nationwide scope and effect[.]"  But this is not what the Act says—instead the determination itself must be of nationwide scope and effect.  And EPA's rewriting would make no sense because EPA could root any action in a consistent application of the CAA, in which case the exception would swallow the rule.  Here EPA's action was based on "intensely factual determinations" tied expressly to state-specific considerations.  *Texas v. EPA*, 829 F.3d 405, 421 (5th Cir. 2016).

Of particular note, EPA's reliance on the recent Sixth Circuit transfer order is specious.  *See* Resp. 31-32.  That case concerned a challenge to EPA's *federal* implementation plans.  Meanwhile, the *same circuit* followed the reasoning of the Fifth Circuit to hold that venue for challenges to Kentucky's *state* implementation plan (as here) was appropriate in the Sixth Circuit.  *See generally Kentucky* slip op. The court reasoned Kentucky's SIP was the relevant unit of administrative action

24

and was locally applicable and "based on a determination of local scope or effect." *Id.* at 2-6. Consistent with that holding, venue is appropriate in this Court.

## VI. Vacatur of EPA's Disapproval of Alabama's SIP Is Appropriate

EPA contends vacatur of EPA's disapproval of Alabama's SIP is "inappropriate" and the disapproval should "remain in place" while it is remanded to the Agency to fix any error. Resp. 58. But "'vacatur is the ordinary APA remedy,'" as the Eleventh Circuit acknowledged in the same case cited by EPA. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1369 (11th Cir. 2008)). Indeed, this Court explained that "when the agency has erred to such an extent as to indicate that its ultimate decision was unlawful"—as is the case here—the Court need not "decide whether remand without vacatur is permissible." *Id.* That is because vacatur is the obvious remedy where EPA's errors include exceeding its statutory authority, which has "incurably tainted the agency's decisionmaking process." *Id.*

Nevertheless, this Court's balancing test of "'the seriousness of the [action's] deficiencies…and the disruptive consequences of an interim change that may itself be changed'" weighs in favor of vacatur. *Id.* (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

*First*, EPA's conclusory claim that "Petitioners primarily allege procedural defects and record-based errors" is wrong. Resp. 59. Petitioners have shown that EPA's disapproval was unlawful because EPA exceeded its statutory authority and misapprehended its role in the cooperative federalism scheme of the Act. EPA unlawfully imposed extra-statutory requirements in rejecting Alabama's 1 ppb threshold and applying its own 4-step framework in evaluating Alabama's SIP. These are not "procedural" deficiencies or factual errors that can be fixed by dotting i's and crossing t's or that EPA can shore-up with additional evidence. EPA must start over and give due deference to the State's choices—as the Tenth Circuit recently required in a similar case involving Wyoming's SIP. *See Wyoming*, 78 F.4th at 1181 (vacating EPA's disapproval of Wyoming's SIP and remanding "for the agency to reconsider Wyoming's [SIP] while giving proper deference to the state and without treating the guidelines as binding").

*Second*, EPA's arguments that a vacatur would "delay" implementation of the good neighbor provision ignores the current status quo. Resp. 59. After the Court stayed EPA's disapproval of Alabama's SIP, EPA rightly revised its FIP for Alabama because it lacks the authority to impose such a FIP. 88 Fed. Reg. 67,102 (Sept. 29, 2023). Now, EPA tells the Court that "without the disapproval, EPA would lack the authority to implement the Good Neighbor Plan for Alabama" and that "is not how the Good Neighbor Provision is supposed to work." Resp. 59-60.

26

But that is *exactly* how the provision works.  If the Court agrees that EPA's disapproval was erroneous, then the current status quo continues, and EPA continues to lack the authority to implement a FIP for Alabama.

*Third*, EPA's assertion that "health benefits vastly outweigh" the cost of compliance grossly overstates the purported "benefits" and, again, ignores the status quo.  Resp. 60.  As previously explained, any downwind contribution of ozone from Alabama to metropolitan Houston is *tiny*, especially in comparison with local ozone created by Texas sources.  *See* Br. 41-43.  And, EPA does not actually conclude that federalizing Alabama's plan would even improve downwind air quality in Texas.  In fact, EPA's modeling shows that even if additional reductions from Alabama are implemented, the result (bizarrely) would be an *increase* in Alabama's ozone contribution to Houston of 0.01 ppb.  *Compare* 88 Fed. Reg. at 9,353, tbl. III.C-1, *with* EPA, *Ozone Air Quality Assessment Tool (AQAT) Results*, at sheet "2023_full_geo_newSCR", cell I-642, http://tinyurl.com/4e39pmz3.

Because EPA's disapproval must be wholly re-evaluated and because air quality will not suffer under the status quo, vacatur is the appropriate remedy.  *See NRDC*, 489 F.3d at 1261 (finding vacatur appropriate because the rules challenged could not "survive[] remand in anything approaching recognizable form").

## CONCLUSION

For the foregoing reasons, the Court should vacate EPA's disapproval of Alabama's SIP.

Respectfully submitted, this 10th day of January, 2024.

STEVE MARSHALL
ATTORNEY GENERAL

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ Lindsay S. Dawson Barton
Lindsay S. Dawson Barton (DAW017)
*Assistant Attorney General*

/s/ Steven Shawn Sibley
Steven Shawn Sibley (SIB002)
*Deputy Attorney General*

**ADDRESS OF COUNSEL:**
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: Robert.Tambling@AlabamaAG.gov
        Lindsay.Barton@AlabamaAG.gov
        Shawn.Sibley@AlabamaAG.gov

/s/ Paul Christian Sasser, Jr.
Paul Christian Sasser, Jr.
*Assistant Attorney General*

**ADDRESS OF COUNSEL:**
Alabama Department of Environmental Management
Office of General Counsel
P.O. Box 301463
Montgomery, Alabama 36130-1463

28

Phone: (334) 271-7855
Fax: (334) 260-4544
Email: pcsasser@adem.alabama.gov

                         <u>s/ C. Grady Moore III</u>
                         C. Grady Moore III
                         Claire B. Johnson
                         BALCH & BINGHAM LLP
                         1901 6th Ave. N., Ste. 1500
                         Birmingham, Alabama 35203
                         205-251-8100
                         gmoore@balch.com

                         *Counsel for Alabama Power Company and*
                         *PowerSouth Energy Cooperative*

29

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel states that this Brief complies with Fed. R. App. P. 32(a)(7) because it does not exceed 6,500 words, excluding the parts exempted by Fed. R. App. P. 32(f).   This response complies with typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

**Dated: January 10, 2024**

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ C. Grady Moore III
C. Grady Moore III
*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing Brief using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

**Dated: January 10, 2024**

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ C. Grady Moore III
C. Grady Moore III
*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*